September 21, 1979

## 79-68  MEMORANDUM OPINION FOR THE GENERAL COUNSEL, IMMIGRATION AND NATURALIZATION SERVICE

### Outer Continental Shelf—Drilling Rigs—Alien Workers (43 U.S.C. § 1333)

We have your request for our views concerning the applicability of the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.,* to persons working on drilling rigs on the Outer Continental Shelf. The question arises in the context of recent amendments to the Outer Continental Shelf Lands Act, the increase in drilling activity on the Shelf, and protests by various domestic groups that alien workers should not be employed on rigs on the Shelf except in conformance with immigration law requirements.

You have provided us with your memorandum dated January 16, 1979, which concludes that the immigration laws do not apply on the Outer Continental Shelf. We have reviewed that memorandum and reach the same conclusion as far as drilling rigs are concerned. Our reasons, however, are somewhat different and depend largely on an analysis of the recent amendments.

We understand that the immigration laws have never been applied to drilling rigs on the Outer Continental Shelf. Furthermore, until recently your agency has never had occasion to confront this question. In 1953 Congress enacted the Outer Continental Shelf Lands Act, 43 U.S.C. 1331 *et seq.,* primarily for the purpose of asserting Federal jurisdiction over the minerals of the Shelf. The original Act is basically a guide to the administration and leasing of offshore mineral-producing properties. Congress adopted the following formula for borrowing domestic law for the Shelf (43 U.S.C. § 1333(a)(1) ):

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources

therefrom, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State * * * .

As enacted in 1953, this language presented two questions of interpretation: whether drilling rigs were included as "artificial islands and fixed structures * * * for the purpose of exploring etc., and whether the immigration laws were among the "laws * * * extended * * * to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State."

You note that the courts have concluded that a drilling rig is a vessel rather than a "fixed structure" within the meaning of § 1333(a)(1). *E.g., Boatel, Inc.* v. *Delamore,* 379 F.(2d) 850 (5th Cir. 1967), and cases collected therein. This was because a rig was designed to float to the place where it will be used and to be attached to the seabed in a relatively impermanent manner, permitting its later removal.

In 1978 Congress amended the Outer Continental Shelf Lands Act. Two of those amendments are crucial here. First, it eliminated the reference to "fixed structures" in § 1333(a)(1) and substituted a reference to "all installations and outer devices permanently or temporarily attached to the seabed." Outer Continental Shelf Lands Act Amendments of 1978, 92 Stat. 635, § 203(a). It is unquestioned therefore that drilling rigs are now within the language of § 1333(a)(1). *See, e.g.,* H. Conf. Rept. 1474 at 80. The question which remains, however, is whether the immigration laws are adopted by the pertinent language of this provision. That, in our view, requires reconciling § 1333(a)(1) with another 1978 amendment that, with certain exceptions, restricts crews of drilling rigs to U.S. citizens or aliens admitted for permanent residence. Section 30, Outer Continental Shelf Lands Act, as added by § 208 of the Outer Continental Shelf Lands Act Amendments, 92 Stat. 669.

If § 1333(a)(1) were considered alone, there are arguments suggesting that the immigration laws should be applied on drilling rigs. Based on a literal reading of that provision, it is certainly possible to conclude that the immigration laws should apply. The 1953 law adopts Federal law "to the same extent as if the Outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State." The immigration laws apply, of course, to Federal enclaves within States. It appears that § 1333(a)(1) was drafted so that it would include Federal laws which, read by themselves, might be interpreted as being limited in their application to the continental United States. *See* W. M. Christopher, "The Outer Continental Shelf Act: Key to a New Frontier," 6 Stan. L. Rev. 23, 42 (1953).[1]

---

[1] This point is similarly argued by our Land and Natural Resources Division in a brief (pp. 46–47) filed on behalf of the Environmental Protection Agency concerning the application of the Clean Air Act to the Outer Continental Shelf. The matter is pending in the U.S. Court of Appeals for the Ninth Circuit. *Exxon Corp.* v. *E.P.A.,* No. 78–1932 *et al.*

This conclusion is supported by the legislative history of the 1953 Act. The House had passed a bill that provided: "Federal laws now in effect or hereafter adopted shall apply to the entire area of the outer continental shelf." H. 5134, § 9(a), reprinted in Outer Continental Shelf, Hearings before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st sess., p. 681 (1953). This Department, writing to the Senate Committee, had commented on the House bill, as you note, and pointed out that it was unclear how the bill would apply where Federal laws by their own terms only applied to places other than the Shelf. Letter from Assistant Attorney General Rankin of May 26, 1953, reprinted in S. Rept. 411, 83d Cong., 1st sess. 32 (1953). It appears that the amendment employing the Federal enclave "within a State" formula was substituted as a response to this criticism, *cf., id.* 23; W. M. Christopher, *op. cit.* Furthermore, specific language dealing with employment of aliens, which had appeared in the original Senate bill,[2] was deleted in committee with the explanation that "since all applicable Federal laws are extended to the seabed and subsoil of the outer shelf, the specific provisions respecting aliens are believed unnecessary." S. Rept. 411, 83d Cong., 1st sess. 24 (1953). Thus, the fact that the Immigration and Nationality Act defines "United States" in a manner that does not include the Continental Shelf, 8 U.S.C. § 1101(a)(38), is not controlling.[3]

As you suggest, the 1953 Act imposed something less than complete sovereignty over the Shelf. This is confirmed by the United Nations Convention on the Continental Shelf, 15 U.S.T. 472, which entered into force for the United States in 1964.[4] *See, Treasure Salvors* v. *Unidentified Wrecked and Abandoned Sailing Vessel,* 569 F.(2d) 330 (5th Cir. 1978) (extension of jurisdiction over the Outer Continental Shelf Act not extension for all purposes). The history of the 1978 amendments suggests, however, that, as a general matter, § 1333(a)(1) should be given broad scope. Two key committee reports state that "Federal law is to be applicable to all activities on all devices in contact with the seabed for exploration, development, and production." H. Conf. Rept. 1474, 95th Cong., 2d sess. 80 (1978); H. Rept. 590, 95th Cong., 1st sess. 128 (1977). The conference report went on to emphasize that one of the purposes of the amendment

---

[2]S. 1901, 83d Cong., 1st sess., § 4(g), reprinted in Outer Continental Shelf Hearings, *supra*, at 2. Under this bill the Attorney General was required to certify that aliens employed on structures covered by the bill were lawfully admitted under the Immigration and Nationality Act.

[3]We cannot, therefore, accept the statement at p. 5 of your memorandum that the Senate bill was reported "notwithstanding the Justice Department's conclusion." The change, in fact, appears to be a result of the Department of Justice comment.

[4]The convention provides that "The coastal State exercises over the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources." Art. 2. The Department of State has expressed the view that immigration control over installations exploiting the natural resources of the Shelf would not violate the convention. Letter of January 15, 1979, from Assistant Legal Adviser, Oceans, Environment and Scientific Affairs, to you. In any event, as a matter of domestic law, the Act, if inconsistent with the convention, would nevertheless prevail *Reid* v. *Covert,* 354 U.S. 1, 18 (1957).

and its legislative history was to make clear that the customs laws applied to drilling platforms. The report asserted that this had, in fact, been the intent of the original 1953 Act. H. Conf. Rept. 1474, at 80–81. Logically, it may be observed that there would seem to be no reason why the customs laws ought to apply on the Shelf while the immigration laws would not. Having thus analyzed § 1333(a)(1) in both a textual and historical context, it would be possible to conclude that, standing alone, it is broad enough to require application of the Immigration and Nationality Act to drilling rigs on the Shelf.

It is necessary, however, to consider the effect of specific language on immigration requirements enacted by Congress in 1978. Section 30 of the Outer Continental Shelf Act, as added by § 208 of the Outer Continental Shelf Lands Act Amendments of 1978, 43 U.S.C. § 1356 (1979 Supp.).[5] These new requirements lead us to a contrary conclusion. In general, the amendment requires that rigs be manned by U.S. citizens or aliens lawfully admitted to the United States for permanent residence. 43 U.S.C.

---

[5]The full text of this provision reads:

Sec. 30. DOCUMENTATION, REGISTRY AND MANNING REQUIREMENTS.—

(a)   Within six months after the date of enactment of this section, the Secretary of the Department in which the Coast Guard is operating shall issue regulations which require that any vessel, rig, platform, or other vehicle or structure—

(1)   which is used at any time after the one-year period beginning on the effective date of such regulations for activities pursuant to this Act and which is built or rebuilt at any time after such one-year period, when required to be documented by the laws of the United States, be documented under the laws of the United States;

(2)   which is used for activities pursuant to this Act, comply, except as provided in subsection (b), with such minimum standards of design, construction, alteration, and repair as the Secretary or the Secretary of the Department in which the Coast Guard is operating establishes, and

(3)   which is used at any time after the one-year period beginning on the effective date of such regulations for activities pursuant to this Act, be manned or crewed, except as provided in subsection (c), by citizens of the United States or aliens lawfully admitted to the United States for permanent residence.

(b)   The regulations issued under subsection (a)(2) of this section shall not apply to any vessel, rig, platform, or other vehicle or structure built prior to the date of enactment of this section, until such time after such date as such vehicle or structure is rebuilt.

(c)   The regulations issued under subsection (a)(3) of this section shall not apply—

(1)   to any vessel, rig, platform, or other vehicle or structure if—

(A)   specific contractual provisions or national registry manning requirements in effect on the date of enactment of this section provide to the contrary;

(B)   there are not a sufficient number of citizens of the United States, or aliens lawfully admitted to the United States for permanent residence, qualified and available for such work; or

(C)   the President makes a specific finding, with respect to the particular vessel, rig, platform, or other vehicle or structure, that application would not be consistent with the national interest; and

(2)   to any vessel, rig, platform, or other vehicle or structure, over 50 percent of which is owned by citizens of a foreign nation or with respect to which the citizens of a foreign nation have the right effectively to control, except to the extent and to the degree that the President determines that the government of such foreign nation or any of its political subdivisions has implemented, by statute, regulation, policy, or practice, a national manning requirement for equipment engaged in the exploration, development, or production of oil and gas in its offshore areas.

§ 1356(a)(3) (1979 Supp.). Unlike the reference to the customs laws quoted above, Congress made no assertion as to whether it thought that the Immigration and Nationality Act applied through the 1953 Act or the 1978 amendment to § 1333(a)(1).[6] The only conclusion that makes sense, however, is to assume that § 30 is intended to be a self-contained statement of the extent to which principles of immigration control are to be applied. The purpose of the conference committee was to "reconcile the dual concerns of providing the fullest possible employment for Americans in U.S. Outer Continental Shelf activities and eliminating to the fullest possible extent the likelihood of retaliation by foreign nations against American workers in foreign offshore activities." In addition, exceptions were included "to avoid any disruption in OCS [Outer Continental Shelf] activities by this manning requirement." H. Conf. Rept. 1474 at 123–24. If the Immigration and Nationality Act were assumed to be in force on drilling rigs, then the exceptions found in the new controls would be meaningless since the immigration laws do not include authority to create exceptions parallel to those in § 30, and the 1978 amendments do not purport to modify the Immigration and Nationality Act. As a result the delicate balance that Congress attempted to strike in § 30 would be upset.

We cannot assume that Congress undertook such a meaningless exercise. *See* 2A Sutherland, *Statutory Construction* § 46.06 (Sands, ed. 1973). Thus, the specific coverage of § 30 should be given precedence over the more general application of the provision for assimilating Federal law on the Outer Continental Shelf. *Id.* at § 46.05 note 11.[7] The force of this argument is emphasized by examining the exceptions in some detail.

---

[6]Our attention has been directed to unpublished transcripts of mark-up sessions of the Conference Committee and the House Ad Hoc Select Committee on the Outer Continental Shelf which indicate that the applicability of the immigration laws was briefly discussed. The transcripts show that at the House Committee mark-up, committee counsel indicated that the law was uncertain and that he could not say what it was. It does not appear that the members expressed any views of their own. House of Representatives, Ad Hoc Select Committee on the Outer Continental Shelf, Mark-up Session, H.R. 1614, July 26, 1977, Tr. 133-A, 133-H, 133-I. At a meeting of the Conference Committee, counsel advised that the immigration laws applied only to American owned and operated platforms; Senator Johnston (La.) expressed a similar view. Transcript of July 20, 1978, Conference Committee on S. 9 at 9, 14–15. The latter interpretation presents difficulties of its own since there seems to be no basis under § 1333(a)(1) or the immigration law for excluding foreign-owned operations taking place on the Outer Continental Shelf from the broad scope of the immigration laws, although § 30 makes such a distinction. Under all the circumstances, we hesitate to interpret this uncertain evidence as showing that Congress shared any common intent concerning applications of the immigration laws.

[7]Another interpretation might be to assume that the immigration laws apply but that exceptions have been impliedly authorized by § 30. It seems more logical, however, to assume, as noted, that Congress, by passing § 30, gave it precedence over 43 U.S.C. § 1333(a)(1), than to reason that Congress meant to alter provisions of the immigration laws, a completely separate statute. Moreover, the latter intepretation would create practical difficulties since both your agency and the Coast Guard would be mandated to enforce essentially similar regulations. This would create unnecessary duplication and give rise to the possibility of inconsistent interpretation and administration. In addition, we do not believe that § 30 divests your agency of jurisdiction over the immigration laws and assigns it to the Coast Guard. If this had been intended Congress would have so indicated, rather than direct the Coast Guard to issue regulations implementing § 30, which makes no reference to the immigration laws.

First, there is an 18-month delay in the effective date of the restrictions from the date of enactment. The Coast Guard has 6 months to issue regulations, which take effect 1 year later. 43 U.S.C. § 1356(a)(1) and (3); H. Conf. Rept. 1474, p. 125.

Second, the restrictions do not apply at all to rigs that are foreign-owned or foreign-controlled unless the President makes certain findings based on lack of reciprocity by other nations. 43 U.S.C. § 1356(c)(2). Third, since the requirement only extends to "manning" or "crewing," specialists, professionals, or other technically trained personnel who handle temporary operations would not be included, H. Conf. Rept. 95-1474 at 125; 43 U.S.C. § 1356(a)(3). Fourth, existing contracts that provide for foreign manning are preserved. 43 U.S.C. § 1356(c)(1)(A). Fifth, the President may make a specific finding that application of the amendment to a particular rig is not in the national interest. 43 U.S.C. § 1356(c)(1)(C).

The only exception in the amendment that parallels the immigration laws is for aliens performing services where there are not a sufficient number of citizens or resident aliens available to perform such services. 43 U.S.C. § 1356(c)(1)(B). The conference report states: "This is virtually the present standard of the immigration law." H. Conf. Rept. 95-1474 at 124. *Compare* 8 U.S.C. § 1101(a)(15)(H)(ii). Implicit in that statement, however, appear to be the assumption that an exception, independent of the immigration laws, is being created.[8]

In considering the effect of the 1978 amendments on the Outer Continental Shelf Act, we must view the statute as a whole. *See* 2A Sutherland, *Statutory Construction,* § 46.05 (Sands, ed. 1973). We conclude that Congress, in enacting the 1978 amendments, did not intend the Immigration and Nationality Act to apply to drilling rigs on the Outer Continental Shelf.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[8]The fact that § 30 operates independently of the immigration laws is also supported by the fact that § 30 appears to apply in some situations where the immigration laws would not. Thus, § 30 directly covers "any vessel, rig, platform, or other vehicle or structure." If the immigration laws were to apply, it would be only by incorporation through 43 U.S.C. § 1333(a) (1), which, as noted, does not apply to "vessels," such as supply ships, but only to artificial islands and installations and other devices "permanently or temporarily attached to the seabed."